DECISION.
This is an appeal from the trial court's order denying a motion for class certification. Plaintiff-appellant Karen Hinkston, on behalf of herself and a proposed class of similarly situated residents of Ohio, brought an action against SunStar Acceptance Corporation, alleging violations of the Ohio Retail Installment Sales Act (ORISA). Hinkston claimed that all individual purchasers of used cars in Ohio who obtained financing from SunStar under its "Bronze" and "Silver" programs during a specified period paid a higher price than they would have if the cars had been sold for cash, and that these price increases were actually finance charges that were not disclosed in the sales contracts, as required by ORISA. Hinkston therefore claimed that she and others similarly situated were entitled to damages under ORISA. The trial court found that Hinkston had failed to satisfy all but one of seven prerequisites for maintaining a class action under Civ.R. 23.
Earlier this year, this court decided a similar case, Hinkston v. TheFinance Co. (May 12, 2000), Hamilton App. No. C-980972, unreported, appeal not allowed (2000), 90 Ohio St.3d 1414, 735 N.E.2d 454 ("HinkstonI"), brought by the same plaintiff in an attempt to certify a class of purchasers of used cars in Ohio for alleged violations of ORISA by another financing company. Since there are no material differences between this case and Hinkston I regarding class certification, we view Hinkston I as controlling authority for the case at bar. Thus, as we held in HinkstonI, while we disagree with some of the trial court's findings, concluding that most of the prerequisites for maintaining a class action have been satisfied, we hold that the trial court did not abuse its discretion when it denied class certification, because the elements of predominance and superiority under Civ.R. 23(B)(3) had not been demonstrated. We also reject each party's claim that the trial court erred in striking the affidavit of the other's expert.
 FACTS AND PROCEDURAL HISTORY
On July 8, 1996, Hinkston decided to trade in her 1988 Oldsmobile Cutlass and to purchase a used 1995 Ford Escort from Mills Used Cars, Inc. According to Hinkston's deposition, she was aware that her equity in the Cutlass was less than what she owed on the loan that she had obtained to purchase the vehicle. She understood that John Mills, the owner of the car dealership, would "take care" of the problem, but the record is unclear as to whether Hinkston knew that Mr. Mills planned to roll over a portion of the negative equity into the price of the Escort. Hinkston stated that the Ford Escort had a window price of $10,995,[1]
and that she did not remember any salesperson offering to sell her the car for less or more than that amount. But the retail installment contract[2] revealed that the "cash price" for the Escort was $10,320 plus taxes, fees and an optional mechanical plan, less a down payment of $1500,[3] leaving $12,163.15 as the amount financed. The contract also set forth a finance charge of $9257.45, the monthly payment amount, the annual percentage rate, and the total sales price. Hinkston made her monthly payments to SunStar until she traded in her Escort for a new Toyota purchased from a different dealer and financed through a different lender.
At the time of Hinkston's purchase of the Escort, a Master Dealer Agreement was in effect between Mills and SunStar, whereby SunStar agreed to purchase retail installment contracts entered into between Mills and its customers when those contracts met the qualifications for one of SunStar's Motor Vehicle Finance programs. Under this agreement, SunStar would review credit applications submitted by purchasers and approve the applicants' credit and the terms of the sales contracts. After a sale, SunStar would purchase the contract from Mills at a discount.
The class of potential plaintiffs identified in this action consists of those who obtained financing from SunStar for the purchase of used cars in Ohio from July 7, 1992, to July 8, 1998. After Hinkston filed her motion to certify the class, the trial court granted a motion to compel (limited) discovery and ordered SunStar to provide Hinkston with Motor Vehicle Contract Worksheets for a list of specific customers and to deliver to Hinkston twenty retail installment contracts. Accordingly, SunStar produced information for 126 customers in Ohio who financed their used-car purchases through SunStar from a total of thirty-nine Ohio dealers; but only seventy-nine individual files were located by SunStar. In connection with the motion for class certification, Hinkston submitted an affidavit of an economist and SunStar submitted an affidavit of a law professor. Each party then moved to strike the affidavit of the other's expert. At the conclusion of argument on all of the motions, the trial court notified counsel by letter that it would deny the motion for class certification and grant both motions to strike. Pursuant to the trial court's request, counsel for SunStar submitted an entry with proposed findings of fact and conclusions of law. No objection was filed by Hinkston; but Hinkston's counsel signed the entry to acknowledge that he had reviewed it.
Hinkston's two assignments of error on appeal challenge, respectively, the trial court's denial of class certification and its decision to strike her expert's affidavit. SunStar has also filed a timely appeal challenging the trial court's decision to strike its expert's affidavit. We have consolidated the two appeals for the purpose of this decision.
 II. CLASS CERTIFICATION
Before reviewing the trial court's denial of class certification, we address Hinkston's contention that the trial court abused its discretion by improperly delegating its opinion-writing function to SunStar. We disagree. As this court has acknowledged, "a trial court may adopt verbatim a party's proposed findings of fact and conclusions of law as its own if it has thoroughly read the document to ensure that it is completely accurate in fact and law. Hinkston I, supra, at 2, citingState v. Combs (1994), 100 Ohio App.3d 90, 110, 652 N.E.2d 205, 218. Hinkston tries to distinguish a court's duty to make written findings of fact and to give reasons for each finding under Civ.R. 23 with the duty to make findings of fact and conclusions of law under Civ.R. 52. We see no basis for any distinction and hold that the "writings" required under Civ.R. 52 and Civ.R 23 are analogous. As long as the trial court thoroughly reviews the document to "ensure that it is completely accurate in fact and law," the court does not err in adopting it. The opinion here is accurate and consistent with the record, and thus, the trial court did not abuse its discretion by adopting it.
 Standard of Review
In Marks v. C.P. Chem. Co., Inc. (1987), 31 Ohio St.3d 200,509 N.E.2d 1249, syllabus, the court stated that "[a] trial judge has broad discretion in determining whether a class action may be maintained and that determination will not be disturbed absent a showing of an abuse of discretion." Further, due deference must be given to the trial court's decision. "A finding of abuse of discretion, particularly if the trial court has refused to certify, should be made cautiously." Id. at 201, 509 N.E.2d at 1252.
 Before an action may be maintained as a class action, the plaintiff must show that all of the requirements of Civ.R. 23(A) and (B) are met; the failure to satisfy any one of the requirements will result in the denial of certification. Schmidt v. Avco Corp.
(1984), 15 Ohio St.3d 310, 313, 473 N.E.2d 822, 824.
B. Application of Class-Action Requirements
As mentioned above, the case at bar is substantially similar toHinkston I, decided by this court earlier this year. In Hinkston, Karen Hinkston alleged that she and others similarly situated were paying more for the purchase of their used cars than they would have if they had paid in cash, and that the price increases were actually undisclosed finance charges that violated ORISA. In Hinkston I, the same used car dealer involved in the case at bar, Mills, had an agreement with The Finance Company ("TFC") whereby TFC would purchase retail installment contracts entered into by Mills and its customers after reviewing the terms of the sales contracts and approving the applicants' credit. Here, Hinkston is alleging the identical claim with corresponding similar facts, except that, in this instance, SunStar had an agreement in effect with Mills whereby SunStar would purchase specific retail installment contracts from Mills at a discount after first reviewing the terms of the sales contracts and approving the purchasers' credit. Due to the similarity between the two cases, the analysis undertaken in Hinkston I regarding the six requirements of Civ.R. 23(A) is applicable to the case at bar. Thus, we conclude that Hinkston has satisfied all of the Civ.R. 23(A) requirements in this case.
First, the identifiable-class requirement is satisfied here because, as in Hinkston I, Hinkston can readily identify potential class members by reviewing SunStar's business records. Second, we agree with the trial court that Hinkston has proved that she is a member of the purported class and thus meets the class-membership requirement. Third, Hinkston has established that the purported class is so numerous that joinder of all members is impracticable. In interpreting this requirement, courts have not specified a minimum number of class members and have even certified classes with as few as twenty-three members. Marks, supra, at 202, 509 N.E.2d at 1252, citing Basile v. Merrill, Lynch, Pierce, Fenner Smith, Inc. (S.D.Ohio 1985), 105 F.R.D. 506. SunStar's records identify at least 126 potential class members. Fourth, Hinkston has met the commonality requirement by identifying the same common nucleus of facts and law that she did in Hinkston I: "whether credit purchasers paid higher prices for used cars, and whether any such price increases amounted to finance charges under the statute". Hinkston I, supra, at 3. Fifth, Hinkston has satisfied the typicality requirement. There is not any "express conflict" between her claim against SunStar and those of other class members. Id. at 4. Finally, we conclude that Hinkston is an adequate representative because her interests are not "antagonistic to other class members." Id. The trial court stated that Hinkston was not an adequate representative because she did not follow the notice provisions for a claim under ORISA. But, as in Hinkston I, there is no indication that other class members gave such notice when Hinkston did not. Further, there is no notice requirement for the willful violation of R.C. 1317.08 that is alleged here. Thus, in accordance with HinkstonI, we conclude that these notice provisions do not cause Hinkston's interests to be antagonistic to other class members.
Having addressed all of the Civ.R. 23(A) requirements, we now turn to the application of Civ.R. 23(B). Hinkston claims that this case qualifies for class-action status under Civ.R. 23(B), which requires findings that that the "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." To determine whether common questions of law or fact predominate over individual issues, "it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." Schmidt, supra, at 313,473 N.E.2d at 825. Whether a class action is the superior method of adjudication requires a comparative evaluation of other available procedures to determine if the judicial time and energy involved would be justified.Id.
As in Hinkston I, the parties' arguments here regarding whether questions of law or fact common to the class members predominate over questions affecting only individual members revolve around the "cash price" of each car. In Hinkston I, supra, we held that Hinkston's definition of cash price, the amount a dealer received from the financing company plus any down payment "is not an accurate indication of the cash price of a car". Id. at 5. Supporting this conclusion in Hinkston I was evidence revealing that there were numerous factors unrelated to the value or price of a car that determined how much the dealer would receive from the financing company, such as a customer's credit history, the terms of each loan, and the customer's employment status and ability to pay. Id. Similarly, there were just as many factors that came into play in determining how much SunStar would pay a dealer to purchase a retail installment sales contract. SunStar reviewed each customer's credit application, looking at employment history and ability to pay, the down payment, residence, gross income, debt ratio, the car payment as a percentage of gross income, and the applicable interest rate. SunStar gave each customer a "score" and categorized the customer as falling into either a Platinum, Gold, Silver, or Bronze program. The Bronze and Silver programs were for customers at a higher credit risk. If a customer fell into one of these programs, SunStar purchased the contract at a discount. This amount was based on the amount financed, less any non-refundable holdback and dealer fees. Thus, as in Hinkston I,
contrary to Hinkston's economic theory, the amount the dealer received was dependent upon other factors than just the value or "price" of the car. In Hinkston I, this court held that the common question of fact involving the price of each used car could not be resolved on a class-wide basis. Regardless of whether Hinkston's economic theory was used, the "trial court would be required to conduct an individualized inquiry into the unique facts and circumstances surrounding the purchase and financing of each used car, to determine whether purchasers actually paid a higher price than they would have if the car had been sold for cash". Id. In this case, the trial court would have to make the same kind of inquiry. Below, John Mills testified that he tried to charge the highest price he thought that he could obtain from an individual customer. Mills was only one of at least thirty-nine car dealerships that also would have to testify to their business practices and credit programs. Further, each customer would have to testify as to the "sticker price on the car, if any, whether that price changed during the negotiation, and what was revealed to him or her" to determine whether a given customer was charged more for a credit sale than for a cash sale.See id. at 6. For example, there is conflict in the testimony in this case as to whether there was a sticker price on the Ford Escort, and whether the price decreased during the negotiation. Additionally, there is the possibility that the price of Hinkston's car may have been raised because "negative equity" in her Cutlass may have been transferred to the price of the Ford.
Hinkston, citing Ojalvo v. Bd. of Trustees (1984), 12 Ohio St.3d 230,233, 466 N.E.2d 875, 877, for the proposition that class certification does not go to the merits of the action, argues that the trial court in this case and this court in Hinkston I ruled on the merits of her claim by stating that her definition of cash price conflicted with the definition in ORISA at R.C. 1317.01. As we held in Hinkston I, supra,
"[a] court is not required to accept a theory of the case that conflicts with a provision of the Revised Code and that is presented in an attempt to simplify a case so that it may be presented as a class action." Id. at 6. Thus, the trial court did not address the merits of Hinkston's claim when determining the validity of class certification. Even under Hinkston's definition of "cash price," which includes the down payment and the amount received from the financing company, there would still have to be an individual inquiry to determine the true "cash price" of each car. For example, Hinkston's contract indicates that she made a $1500 down payment, but she actually paid nothing. Since each transaction is different, depending on such things as the business practice of the dealer and the customer's ability to negotiate, an individual inquiry into each transaction is necessary. Accordingly, we conclude that the predominance requirement is not met because questions affecting individual class members, i.e., the cash price of each car, predominate over common questions.
We also hold that a class action in this case is not superior to other available methods for a fair and efficient adjudication of the controversy. One of the considerations set forth in Civ.R. 23(B)(3)(c) for determining whether a class action is appropriate is the desirability or undesirability of concentrating the litigation of the claims in a particular forum. SunStar purchased contracts from approximately thirty-nine different dealers, and approximately twenty-three of these dealers are located outside of Hamilton County. It would be more efficient and convenient for these claims to be heard in the counties where the dealers do business. See Hinkston I, supra, at 7. Finally, we agree with the trial court's opinion that the management of this as a class action would require many individualized inquiries into specific transactions that would sorely tax the resources of the court. See id.
Since the predominance and superiority requirements of Civ.R. 23(B) have not been demonstrated, we hold that the trial court did not abuse its discretion in denying Hinkston's motion for class certification.
 III. MOTIONS TO STRIKE THE AFFIDAVITS OF HINKSTON'S AND SUNSTAR'S EXPERTS
Hinkston, in her second assignment of error, and SunStar, in its only assignment of error, contend that the trial court abused its discretion when it struck the affidavit of each party's expert. A trial court has broad discretion in determining the admissibility of evidence. Rigby v.Lake County (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, 1058. This court has previously held that "[a]n appellate court will not disturb a decision of the trial court to admit or exclude evidence absent `a clear and prejudicial abuse of discretion.'" Fulwiler v. Schneider (1995),104 Ohio App.3d 398, 408, 662 N.E.2d 82, 88 (quoting O'Brien v. Angley
[1980], 63 Ohio St.2d 159, 163, 407 N.E.2d 490, 493).
The trial court, without setting forth its reasons, struck the affidavit of Hinkston's expert, Dr. Paul Rubin, which was offered in support of Hinkston's "economic theory," and the affidavit of SunStar's expert, Ralph J. Rohner, which was offered to show the business practices in the used-car market. SunStar claims that the trial court's decision to strike its affidavit was prejudicial because Professor Rohner provided necessary background information regarding business practices in the used-car market. From our review of both affidavits and the entire record, we conclude that the trial court did not abuse its discretion in refusing to admit the experts' affidavits, and that neither party was prejudiced. Both experts, overstepping their bounds, drew legal conclusions regarding the definition of "cash price" under ORISA. SeeDawson v. Williamsburg of Cincinnati Mgt. Co. (Feb. 4, 200), Hamilton App. No. C-981022, unreported (an expert may not testify in an attempt to interpret a statute). Further, neither affidavit provided the trial court with any additional helpful information pertaining to whether Hinkston had met her burden for class certification. And, regardless of whether the affidavits drew legal conclusions, neither party suffered any prejudice from their exclusion because the information and theories in the affidavits were also presented in the testimony of Hinkston, John Mills and Jerry Bayless, a representative of SunStar. Accordingly, we hold that the trial court did not abuse its discretion in striking both affidavits.
 IV. CONCLUSION
For the reasons stated above, Hinkston's two assignments of error and SunStar's sole assignment of error are overruled, and the judgment of the court of common pleas is affirmed.
Doan and Winkler, JJ., concur.
[1] According to John Mills's deposition, there were no sticker prices on any of the cars in his used-car lot. A customer could only learn the price of a car by asking either Mills or a sales associate. Mills testified that the price quoted to the customer was the highest price Mills believed he could ask for without scaring away the purchaser.
[2] The record indicates that there were actually two retail installment sales contracts created for Hinkston's purchase of the Ford. One contract listed the "cash price" of the Escort as $10,995, and the other had a "cash price" of $10,320. SunStar used the latter to calculate Hinkston's monthly payments.
[3] The retail installment contract indicated that Hinkston had made a down payment of $1500; however, the record indicates that Hinkston never paid Mills the $1500.